FILED
2022 Feb-24  PM 12:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ANDRAE MARTINIZE CROOK,** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:21-CV-08001-KOB** |
| | ) | **1:19-CR-296-KOB-HNJ-1** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on Mr. Crook's motion to vacate his sentence pursuant to 28 U.S.C. § 2255, in which he claims ineffective assistance of counsel because "counsel failed to file [a] notice of appeal." (Docs. 1 & 9). After the Government moved to dismiss Mr. Crook's habeas motion as untimely, Mr. Crook asked the court to apply equitable tolling to excuse his untimely filing. (Docs. 14 & 16).

The court appointed William Broome to represent Mr. Crook in this habeas action and held an evidentiary hearing on February 14, 2022 on both the equitable tolling and IAC issues. As stated on the record during the evidentiary hearing and for the following reasons, the court will apply equitable tolling in this case to Mr. Crook's untimely habeas motion and grant Mr. Crook's habeas relief.

1

**BACKGROUND CRIMINAL CASE**

The court appointed Assistant Federal Public Defender Alex Vlisides[1] to represent Mr. Crook during his criminal case that included his plea and sentencing hearings.  Pursuant to a *blind* plea, Mr. Crook pled guilty on July 30, 2019 to the charge of felon in possession of a firearm. (Docs. 1 & minute entry on July 30, 2019 in 1:19-cr-296-KOB-HNJ).

The Pre-sentence Report (PSR) from Probation included a four-level enhancement under USSG §2K2.1(b)(6)(B) for Mr. Crook using or possessing the firearm in connection with another felony offense—a Domestic Violence, 2nd Degree charge in Calhoun County CC19-885, alleging that he struck his girlfriend in the face with the firearm.  Based on this enhancement, the PSR attributed to Mr. Crook a total offense level of 25 and a criminal history category of V, with a Guideline range of 100 to 125 months imprisonment.  (Doc. 20 in 1:19-cr-296-KOB-HNJ).

Mr. Vlisides filed an objection to Mr. Crook's PSR, specifically objecting to the allegations that Mr. Crook struck his girlfriend in the face with the firearm and to the four-level enhancement under USSG §2K2.1(b)(6)(B) for using or possessing the firearm in connection with an assault.  In those objections, Mr.

---

[1] Mr. Vlisides is currently with the Federal Public Defender's Office in Wisconsin.

Vlisides stated that Mr. Crook denies "the allegation that he used the firearm in an assault."  (Doc. 15 in 1:19-cr-296-KOB-HNJ).

The court overruled Mr. Crook's objections to the PSR and sentenced Mr. Crook on December 12, 2019 to 100 months imprisonment—the low end of the enhanced guideline range.  Mr. Crook did not file an appeal.

Mr. Crook is currently serving his federal sentence at USP Coleman II.

**BACKGROUND OF § 2255 MOTION**

Mr. Crook filed his § 2255 habeas action on January 19, 2021, alleging that Mr. Vlisides "failed to file [a] notice of appeal." The court issued a Show Cause Order to the Government on March 29, 2021, giving it until April 14, 2021 to respond. (Docs. 1 & 2).  After extending the Government's obligation to respond pending Mr. Crook's response to the FPDO's motion for a ruling on the attorney client privilege issue (docs. 4, 6, 10, 12), the Government responded on August 4, 2021 with a motion to dismiss the habeas motion as untimely (doc. 14).

In its motion to dismiss, the Government notes that the court entered its judgment on December 12, 2019, and that Mr. Crook had 14 days from that date to file an appeal with the Eleventh Circuit—or until December 26, 2019.  The Government argues that Mr. Crook's conviction became final on December 26, 2019 "when the time for seeking . . . [direct appellate] review expire[d]." (Doc. 20 at 3) (quoting *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011)).  So,

Mr. Crook had one year from December 26, 2019—or until December 26, 2020—
to file his habeas action. But he did not file it until January 19, 2021, the day he
signed it and presumably gave it to prison officials to mail.  (Doc. 14).

      The court issued a Show Cause Order to Mr. Crook on August 6, 2021,
ordering him to respond to the Government's motion to dismiss.  (Doc. 15).  In his
response, Mr. Crook seemed to acknowledge that his habeas action was untimely
but asked the court to apply equitable tolling because "the COVID 19 pandemic
and BOP procedures prevented Mr. Crook from filing a timely § 2255" petition.
(Doc. 16). Mr. Crook attached to his petition a memo from "C. Tipton, G/H Unit
Manager" dated August 23, 2021, in which Mr. Tipton stated that because of
"unforeseen events during the COVID-19 pandemic, Mr. Crook did not have
access to his legal documents/records for legal filing in a timely manner. As such
he has not been able to adequately respond to Court proceedings."  (Doc. 16 at 6).

      The court ordered the Government to reply to Mr. Crook's response
regarding his untimeliness.  (Doc. 17).  In its reply, the Government opposed the
court applying equitable tolling.  The Government included an affidavit from Mr.
Tipton "more thoroughly addressing issues Mr. Crook raised in his equitable-
tolling pleading."  (Doc. 20 at 6 and doc. 20-6).  Mr. Tipton's affidavit submitted
by the Government indicated that, although Mr. Crook was restricted from going to
the law library or education department, Mr. Crook could obtain a § 2255 form

using the electronic law library computer and request stamps during the quarantine period from September 20, 2020 until November 23, 2020. (Doc. 20-6 at 2).

The Government also included in its reply an affidavit from Mr. Vlisides indicating, among other things, that on July 16, 2019 he met with Mr. Crook at Hoover City Jail to review the "plea agreement proposed by the government"; that he advised Mr. Crook that the Government's offer to recommend a sentence "'within' the guideline range . . . held minimal practical value for him"; that he discussed with Mr. Crook the "costs and benefits of pleading guilty without a plea agreement," including the benefit of preserving Mr. Crook's right to appeal; that Mr. Crook was silent immediately after the sentencing hearing when Mr. Vlisides informed him of his right to appeal; and that Mr. Crook never instructed him to file an appeal. (Doc. 20-8 at 2-3).

Mr. Crook responded to the Government's reply, specifically taking issue with several statements in Mr. Tipton's affidavit that Mr. Crook called "false" and "misleading." (Doc. 21). Because of the contested issues of fact, the court set an evidentiary hearing on both the equitable tolling issue and the IAC claim.

**EVIDENTIARY HEARING**

As the court previously stated, it held an evidentiary hearing in this matter on February 14, 2022. The court heard testimony from Mr. Crook in person and

from Mr. Tipton and Mr. Vlisides via ZOOM with the consent of all parties.  (Doc.
25).

**Mr. Crook's testimony**

Mr. Crook testified that after his sentencing in December 2019, he went
back into state custody until around February 2020.  He then travelled to prisons in
Limestone County, Cullman County, Clay County, Lovejoy, and finally landed at
USP Coleman II on March 12, 2020.

When he arrived at Coleman II, Mr. Crook had no orientation because of the
COVID-19 pandemic. Also, he tried to get in touch with his case manager Ms.
Bailey but was unable to do so the first week or two of his arrival. Because prison
is a "very dangerous place to be," Mr. Crook was hesitant at first to trust or talk
with inmates he did not know about his personal business or criminal case.
Initially, he did not "feel comfortable" talking with other inmates about how things
worked in prison, the law, or his case because they might use it against him in
some way.

Mr. Crook testified that, around the end of March or beginning of April
2020, his unit at Coleman II was in a hard lock down for about a month because of
COVID-19. During that hard lock down, he could not go to the chow hall and ate
meals in his cell; could leave his cell only to shower sometimes every other day;

and had no access to anything out of his cell.  After about a month, the lock down eased some.

During this "lighter lock down," the inmates were able to leave their cells in tiers of about 60 inmates at a time for about an hour or so each day to shower; access the one electronic law library computer; access one of three computers to email family or prison staff; use the phones; but could not go to the law library or education department.  Mr. Crook stated that during this lighter lock down, inmates would run out of their cells to access the computers and phones; that he witnessed inmates fighting over the use of the computers and phones; and that he saw a constant line of inmates to use the electronic law computer.

Mr. Crook testified that his unit at Coleman II went between a hard and lighter lock down several times between March and August 2020.  During this time, the counselors and prison staff barely came around Mr. Crook's unit. When staff did come around, the inmates complained so much about the lock downs that staff did not stay around long. He also testified that he asked prison staff for "thousands" of things but did not receive them during this time.

Sometime in June or July 2020, Mr. Crook felt comfortable enough to share his personal information with Brian, a jailhouse lawyer who was housed in Mr. Crook's tier. During this time, Brian told Mr. Crook about the possibility of filing a § 2255 motion.

In August 2020 Mr. Crook tested positive for COVID-19 and was placed in quarantine where he could not come out of his cell.  COVID-19 caused Mr. Crook to suffer a severe headache, loss of taste and smell, loss of energy, weakness, and bone chills for a week or two.

Then, from September 20, 2020 through November 23, 2020, his entire unit was placed on a total quarantine because of a COVID-19 outbreak.  During that quarantine period, he could not come out of his cell except to shower and had no access to any of the computers or phones.

During this COVID-19 quarantine from September through November 2020, Mr. Crook used "fishing" with a sheet to slide his paperwork to Brian for him to work on a § 2255 motion for Mr. Crook.  Brian used a § 2255 form he already had to prepare one for Mr. Crook, but initially told Mr. Crook that he had to get a § 2255 form himself.  And Mr. Crook testified that Brian would not give him what he had prepared until Mr. Crook paid him.  Mr. Crook testified that he was indigent and had no money to pay Brian.  Although Mr. Crook is a hard worker, because of COVID-19, he had no opportunity to work to earn money and has no financial support from his family.

Mr. Crook testified that Brian told him sometime toward the middle or end of December 2020 that Mr. Crook's deadline for filing his § 2255 was December 26, 2020, but that Mr. Crook had an additional 60 days to file it because of

COVID-19. Around the time of Mr. Crook's deadline, Brian was waiting to be paid before he would provide anything to Mr. Crook to file his § 2255.

On January 4, 2021, Mr. Crook borrowed a stamp from his cellmate because Mr. Crook had no money on his account to buy a stamp and sent a written request to the Clerk of Court for a blank § 2255 form.  He testified that he did not write the Clerk earlier for the § 2255 form because of the lock downs, stress he was under, and the mistreatment he received during the lock downs.

After Mr. Crook received the § 2255 form from the Clerk, his cell mate provided money for Mr. Crook to pay Brian for the § 2255 motion he had prepared for Mr. Crook.  Although the record is not clear as to exactly when Mr. Crook received this completed § 2255 form from Brian, Mr. Crook testified it was after he sent the request to the Clerk for the blank form. Once Mr. Crook received a copy of what Brian had prepared, Mr. Crook copied it in his own handwriting on the § 2255 form he received from the Clerk. Mr. Crook signed the § 2255 form on January 19, 2021 and gave it to the prison staff, with another stamp he borrowed from his cell mate.

Regarding his direct appeal, Mr. Crook testified he was shocked and upset when the court sentenced him to 100 months for a non-violent crime.  He said that, after the sentencing hearing, Mr. Vlisides talked to him for only about three to five minutes in the courtroom.  Mr. Crook testified that Mr. Vlisides told him that he

would come see him at Talladega Jail to discuss his appeal, but they did not talk about the appeal in the courtroom at sentencing during those three to five minutes.

When Mr. Vlisides did not come to Talladega to talk to Mr. Crook about his appeal, Mr. Crook called Ms. Vlisides' office about six to eight times within the fourteen days after his sentencing because he wanted to file a direct appeal.[2]  Mr. Crook left messages with a "woman secretary" at Mr. Vlisides' office that he wanted to talk to Mr. Vlisides about his appeal; he testified that the female indicated that she would give Mr. Vlisides those messages.  But Mr. Vlisides did not return calls to Mr. Crook or come see him in prison after the sentencing hearing.  Mr. Crook never saw Mr. Vlisides again after sentencing.  Mr. Crook never received any letter or a copy of his judgment from Mr. Vlisides; in fact, the first time he saw a copy of his judgment was when his habeas counsel recently showed it to him.  Mr. Crook testified he wanted to appeal his sentence.

**Mr. Tipton's testimony**

Mr. Tipton was the Unit Manager and inmate programming supervisor for both the H1 and H2 Units at Coleman II and supervised about 250 inmates.

Mr. Tipton stated that the COVID-19 pandemic affected the H Units and caused "modified procedures."  Beginning around April 1, 2020, inmates could come out of their cells by tiers for about 2-3 hours each day to use the electronic

---

[2] Mr. Crook testified that calls to the Federal Public Defender's Officer were free from inmates.

10

law library computer, phones, computers for email, and to shower.  Mr. Tipton

testified that each Unit had one electronic law computer for about 60 inmates to

use during the time out of their cells. And during these "modified procedures,"

inmates could fill out a commissary form once a week to purchase postage, pens,

paper, and other commissary items if they had money in their accounts, and

commissary staff would deliver those items to them in their cells.

He testified that the H Unit continued to use these modified procedures until

September 20, 2020 when it went into quarantine until November 23, 2020

because of a COVID-19 outbreak in the Unit.  Mr. Tipton indicated *in his affidavit*

submitted prior to the evidentiary hearing that, during this quarantine period,

inmates could still get stamps by giving a written request to a staff member; could

not go to the commissary; and could not go to the law library or education

department. Mr. Tipton also indicated *in his affidavit* that, during the quarantine

period, inmates could get § 2255 forms two ways: by accessing the electronic law

library computer or submitting a written "Cop-Out" form to prison staff requesting

a § 2255 form. But at the evidentiary hearing Mr. Tipton testified that his affidavit

was incorrect because inmates were *not* allowed access to the electronic law library

computer, or any computers, during the quarantine period.  So, he testified that,

during the quarantine period from September until November 2020, an inmate

11

would have to submit a written "Cop-Out" form to a staff member to request a §
2255 form.

Mr. Tipton also testified that Mr. Crook asked him in August 2021 to write a
memo on his behalf explaining how COVID-19 affected inmates' ability to timely
file documents with the court. Mr. Tipton said that the Warden authorized him to
give inmates a memo such as the one he gave Mr. Tipton in August 2021; that ten
inmates had requested such a memo; and that, although he individualized each
memo, the substance of the memo was "pretty much the same."  He testified that
his August 2021 memo was incorrect because it should have specified that the time
frame for the statements in the memo was the quarantine period from September
through November 2020. But he testified that he did not make that same mistake in
the other ten memos he wrote for other inmates.

**Mr. Vlisides' testimony**

Mr. Vlisides testified that the government offered Mr. Crook a plea deal, but
Mr. Vlisides could not remember if that offer was written or verbal. But he did
remember discussing with Mr. Crook the advantages of entering a blind plea,
including preserving Mr. Crook's right to appeal.  In his affidavit submitted prior
to the evidentiary hearing, Mr. Vlisides specifically stated that "I outlined those
potential benefits for him, including a greater ability to dispute the government's

allegations concerning non-elemental facts in the case and preservation of Crook's right to appeal."

He testified Mr. Crook was "upset" after the sentencing hearing and that he talked to Mr. Crook for less than five minutes in the courtroom after that hearing. According to his affidavit, Mr. Vlisides told Mr. Crook during this conversation that "it was his choice whether to appeal the judgment"; that "unless he instructed me to, I did not intend to file a notice of appeal"; and that he "did not believe that meritorious grounds existed to support an appeal." In his affidavit, Mr. Vlisides stated that Mr. Crook "did not respond to my questions or my statements." (Doc. 20-8 at 3). But he testified at the evidentiary hearing that the guideline enhancement issue regarding Mr. Crook's alleged use of the firearm in an assault, to which he filed written objections, could have been raised on direct appeal.

Mr. Vlisides testified that he did not visit Mr. Crook in Talladega County Jail within the 14-day appeal deadline and that he did not recall talking to Mr. Crook after the day of the sentencing hearing about an appeal. Mr. Vlisides did admit that, although the normal practice at the Federal Public Defender's Office was to send a letter to each client with a copy of the judgment and information about an appeal and to keep that letter in the file, Mr. Vlisides could find no record of sending Mr. Crook a letter or a copy of his judgment. So, Mr. Vlisides testified

that he had no basis to say he in fact did send Mr. Crook a letter or copy of his judgment.

## ANALYSIS

### Equitable Tolling

As the court stated on the record at the evidentiary hearing, Mr. Crook's habeas motion is untimely. The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year statute of limitations for filing a habeas motion under 28 U.S.C. § 2255, which begins to run "the date on which the judgment of conviction becomes final." *See* 28 U.S.C. § 2255(f)(1). "[P]ro se litigants, like all others, are deemed to know of the one-year statute of limitations." *Outler v. United States*, 485 F.3d 1273, 1282 n. 4 (11th Cir. 2007).

The court entered its judgment on December 12, 2019, and Mr. Crook had 14 days from that date to file an appeal with the Eleventh Circuit—or until December 26, 2019. Mr. Crook's conviction became final on December 26, 2019 "when the time for seeking . . . [direct appellate] review expire[d]." *See Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011).

So, Mr. Crook had one year from December 26, 2019—or until December 26, 2020—to file his habeas action. But he did not file it until January 19, 2021. So, his § 2255 motion is untimely. But, as the court also explained on the record at

the evidentiary hearing, it will apply equitable tolling to excuse the untimeliness of Mr. Crook's habeas motion.

Mr. Crook requests equitable tolling on two grounds: (1) his counsel "effectively abandoned him post-sentencing" and (2) the "COVID-19 pandemic and BOP procedures prevented [him] from filing a timely § 2255." (Doc. 16). He requests that the court toll the statute of limitations "at least 75 days due to the COVID-19 pandemic" because it "qualifies as an extraordinary circumstance that prevented his filing of his § 2255." (Doc. 16 at 1). He later asks for equitable tolling of 45 days (doc. 16) and 44 days (doc. 21).

When a movant files a § 2255 motion outside of the statute of limitations period, the court may still review the motion *if* the petitioner shows that the doctrine of equitable tolling applies.[3] *San Martin v. McNeil*, 633 F.3d 1257, 1267 (11th Cir. 2011). Under the equitable tolling doctrine, the petitioner has the burden of proving that the circumstances warrant application of the doctrine. *Id.* at 1268 (citing *Drew v. Dept. of Corrects.*, 297 F.3d 1278, 1286 (11th Cir. 2002)).

Equitable tolling is a "rare and extraordinary remedy" and applies only if Mr. Crook shows "(1) that he has been pursuing his rights diligently, *and* (2) that some

---

[3] The court can also consider an untimely habeas motion if "a fundamental miscarriage of justice has occurred" whereby a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013). But Mr. Crook has not raised actual innocence as a basis for the court to consider his untimely habeas motion.

extraordinary circumstance stood in his way and prevented timely filing." *See San Martin*, 633 F.3d at 1267, 1271 (quoting *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010)) (emphasis added) (internal quotation marks omitted).  To be eligible for equitable tolling, Mr. Crook must establish both elements. *See Damren v. Florida*, 776 F.3d 816, 821-22 (11th Cir. 2015).

Under the first requirement of equitable tolling, Mr. Crook must pursue his rights with "*reasonable* diligence," rather than "maximum feasible diligence." *See Holland*, 130 S. Ct. at 2565 (emphasis added).  Furthermore, under the second requirement, Mr. Crook must show that an extraordinary circumstance *beyond his control* prevented him from filing the petition timely.  *San Martin,* 633 F.3d at 1267.

In an unpublished opinion, a panel of the Eleventh Circuit hinted that delays because of COVID-19 can be extraordinary circumstances for the purpose of equitable tolling if a prisoner can demonstrate unique circumstances to him that warrant equitable tolling. *See Rush v. Sec'y, Fla. Dep't of Corr.*, No. 21-10218-C, 2021 WL 3134763, at *1 (11th Cir. June 22, 2021) ("He also could not show extraordinary circumstances, as his circumstances were not different than any other prisoner attempting to access legal resources, as they all were subject to COVID-19 protocols.").  So, Mr. Crook must demonstrate *unique* circumstances in his case apart from other prisoners that prevented *him* from filing a timely habeas motion

16

because of the COVID-19 pandemic.  *See Hillard v. United States*, 2022 WL 165006 (S.D. Ga. January 18, 2022).

Several courts have considered whether the COVID-19 pandemic is an extraordinary circumstance that provides justification for untimely habeas filings, and each have held that an individual must show that he was diligently pursuing his rights, and specifically how the pandemic prevented *him* from timely filing, apart from general prison policy or lockdowns. *See., e.g., Franco v. United States*, 8:20-cv-2822-T-27JSS, 2021 WL 1546021 (M.D. Fla. April 20, 2021) (finding that COVID-19 pandemic was not an extraordinary circumstance for equitable tolling where petitioner did not adequately explain why he could not file his habeas motion prior to the imposition of COVID-19 restrictions in the prison); *Powell v. United States*, CV121-023, 2021 WL 2492462 (S. D. Ga. May 24, 2021) (equitable tolling not appropriate where habeas petitioner failed to show diligent efforts to pursue his rights before the COVID-19 pandemic began); (*Dunn v. Baca,* No. 3:19-cv-702-MMD-WGC, 2020 WL 2525772 (D. Nev. May 18, 2020) (equitable tolling allowed where petitioner, represented by the Federal Public Defender, was diligently pursuing claim in the face of "the extraordinary circumstance of the COVID-19 pandemic").

As an initial matter and as stated on the record in the evidentiary hearing, the court finds Mr. Crook's testimony at the evidentiary hearing more credible than

that of Mr. Tipton, who admitted errors in both his August 2021 memo and his affidavit.  Perhaps Mr. Tipton's errors were unintentional but at best they were careless.  And the court finds that Mr. Tipton's testimony appeared to lessen the effects of the COVID-19 pandemic on the inmates by stating that he never saw a line at the electronic law library computer when 60 inmates had access to only one law library computer during a few hours each day; that statement seems incredible. Or, perhaps as Mr. Crook stated, Mr. Tipton rarely went to the unit when the inmates were out.  And Mr. Crook seemed more credible in that he tried hard to listen and respond, even when his answers were not particularly helpful to his case. Although some discrepancies may have existed between Mr. Crook's testimony and his prior filings, the court finds his testimony at the hearing credible.

The court finds that many factors, including the COVID-19 pandemic, created an extraordinary circumstance that prevented Mr. Crook from filing his § 2255 motion in a timely manner.  In making this finding, the court considered the facts that, between his sentencing in December 2019 through his arrival at Coleman II in March 2020, he travelled to several prisons and was in no place for very long; Mr. Crook arrived at Coleman II during the COVID-19 pandemic and did not have the standard orientation for inmates; Mr. Crook was in a hard lockdown in his cell until around May 2020 with hardly any access to other inmates and no access to the law library, education department, or computers; that

between around May 2020 and August 2020, Mr. Crook's H Unit went back and forth between a hard and a lighter lock down; in the lighter lock down periods, Mr. Crook had limited access to staff and the electronic law library with 60 inmates attempting to access one computer during a one to three-hour time frame each day or every other day; Mr. Crook contracted COVID-19 in August 2020 and was quarantined in his cell for weeks with severe symptoms; his entire Unit was on quarantine from September 20, 2020 through November 23, 2020, with no access to the computers and very limited access to prison staff; Mr. Crook was indigent and had no ability to work because of COVID-19; he had no money for stamps or to pay a jailhouse lawyer; and the Warden of Coleman II recognized that COVID-19 affected inmates' ability to timely file documents when he authorized Mr. Tipton to write a memo for Mr. Crook and other inmates explaining as much.

So, the court finds that *all* of these facts together created an extraordinary circumstance *beyond Mr. Crook's control* that caused him to file his habeas motion only three weeks late.

The court also finds that Mr. Crook exercised *reasonable* diligence in trying to file his habeas motion in a timely fashion given his exceptional circumstances. Mr. Crook sought the help of jailhouse lawyer Brian to help him understand and file his § 2255 motion. During the extraordinary circumstances as described above, Mr. Crook tried the best he could to communicate with Brian about his

19

habeas motion, including using the "fishing" method to pass papers between him and Brian; Mr. Crook's indigency delayed his ability to pay his jailhouse lawyer for help with his § 2255 motion; he wrote the Clerk of Court for a § 2255 form and sent in his § 2255 motion within ten days of receiving that form; and he arranged for his cellmate to pay his jailhouse lawyer for the § 2255 form prepared by Brian. All of these efforts show *reasonable* diligence, especially given the extraordinary circumstances Mr. Crook faced in his Unit at Coleman II during the COVID-19 pandemic.

Even if the court applied equitable tolling for only the 45 days that Mr. Crook's Unit was on a total quarantine, his habeas motion would have been timely when he filed it on January 19, 2021.  Because Mr. Crook has shown an extraordinary circumstance that prevented him from timely filing and reasonable diligence in pursuing his rights, the court will deny the Government's motion to dismiss (doc. 14) and apply equitable tolling in this case to consider his habeas motion.

## IAC for Failure to Appeal

Mr. Crook alleged in his habeas motion that Mr. Vlisides' "failure to file a notice of appeal constitutes ineffective assistance of counsel." (Doc. 1 at 4).  In a later filing, Mr. Crook stated that Mr. Vlisides had "abandoned" him after his

sentencing and was ineffective because he "failed to file a notice of appeal after Mr. Crook was sentenced."  (Doc. 9 at 1).

To prove ineffective assistance of counsel, Mr. Crook must demonstrate that (1) his counsel's performance fell below an objective standard of reasonableness; *and* (2) he suffered prejudice because of that deficient performance.  *Strickland*, 466 U.S. at 687-88, 692.  To succeed, a petitioner must establish *both* prongs.

"A lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable" under the first prong of the *Strickland* test.  *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Peguero v. United States*, 526 U.S. 23, 28 (1999), and *Rodriquez v. United States*, 395 U.S. 327 (1969)). Mr. Crook stated in his affidavit in support of habeas motion that he advised Mr. Vlisides "immediately after sentencing" to file an appeal.  (Doc. 9).  But Mr. Crook did not testify at the evidentiary hearing that he told Mr. Vlisides immediately after the sentencing hearing to file an appeal. When asked at the evidentiary hearing if Mr. Crook discussed the appeal with Mr. Vlisides immediately after the sentencing in the courtroom, Mr. Crook said they did not discuss the appeal at that time.  Mr. Crook testified that Mr. Vlisides told him that he would come to Talladega Jail to talk with Mr. Crook about his appeal, but Mr. Vlisides never came.

21

Mr. Crook testified at the evidentiary hearing that another inmate named Tom had written that later filing for him and Mr. Crook copied in his own handwriting what Tom had provided to him.  Mr. Crook testified that Tom added on his own the part about advising Mr. Vlisides immediately after sentencing to file an appeal, and Mr. Crook could not explain exactly why he kept that part in the filing when he re-wrote it in his own handwriting.  Also, Mr. Vlisides testified that Mr. Crook did not say anything after sentencing.  Nevertheless, the court finds credible Mr. Crook's testimony at the hearing that he in fact did not specifically tell Mr. Vlisides immediately after the sentencing hearing to file a notice of appeal. Again, this situation supports the court's credibility finding that Mr. Crook tried to testify truthfully at the evidentiary hearing even when that testimony was not most beneficial to him.

So, based on Mr. Crook's testimony at the evidentiary hearing, he did not specifically instruct Mr. Vlisides immediately after the sentencing hearing to file an appeal; instead, he expected Mr. Vlisides to visit him in jail to discuss an appeal as Mr. Vlisides said he would do.  When Mr. Vlisides failed to visit Mr. Crook at Talladega Jail, Mr. Crook left messages for him with the receptionist at his office regarding Mr. Crook's desire to appeal.  But Mr. Crook alleged in his initial habeas motion and in his subsequent affidavit that Mr. Vlisides was ineffective because he abandoned Mr. Crook after the sentencing hearing and because he failed to file a

notice of appeal on his behalf.  (Docs. 1 & 9).  And Mr. Crook testified at the evidentiary hearing that Mr. Vlisides abandoned him after the sentencing hearing by telling Mr. Crook that he would come to Talladega to discuss the appeal but failing to follow through with pursuing an appeal for Mr. Crook.

So, was Mr. Vlisides' performance deficient for failing to file a notice of appeal when Mr. Crook did not affirmatively tell Mr. Vlisides at the sentencing hearing to file an appeal but Mr. Vlisides failed to talk to Mr. Crook *after* the sentencing hearing?  The Supreme Court in *Roe v. Flores-Ortega* addressed a similar issue.  528 U.S. 470 (2000).  In *Flores-Ortega*, the question presented was whether counsel was "deficient for not filing a notice of appeal when the defendant has not clearly conveyed his wishes one way or the other."  *Id*. at 477.  The Supreme Court in *Flores-Ortega* held that "counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing."  *Id*. at 480.  In making this decision, the district court must consider "all information counsel knew or should have known."  *Id*.

In this case, Mr. Vlisides' failure to consult with Mr. Crook after the sentencing hearing about his appeal constituted deficient performance.  Mr.

Vlisides had every reason to believe that Mr. Crook would want to file a direct appeal: he counseled Mr. Crook to accept a *blind* plea so Mr. Crook could preserve his right to appeal; he filed legitimate, albeit overruled, objections to Mr. Crook's PSR based on the four-level enhancement for allegedly using the firearm during an assault; and he knew that Mr. Crook had a non-frivolous ground on which to base an appeal. Mr. Vlisides also knew that Mr. Crook was upset about his 100-month sentence after the sentencing hearing and did not respond to Mr. Vlisides immediately after the sentencing hearing; Mr. Crooks' silence and demeanor after the sentencing hearing should have prompted Mr. Vlisides to reach out to Mr. Crook within the time to appeal.  Also, Mr. Vlisides failed to follow FPDO procedures when he did not send Mr. Crook a letter and copy of his judgment. The court finds credible Mr. Crook's testimony at the evidentiary hearing that Mr. Vlisides told him after sentencing that he would come to Talladega Jail to discuss his appeal but failed to do so. So, the court finds that Mr. Vlisides had at least a reason to get a definite answer regarding whether Mr. Crook wanted to appeal his case.

The court also finds that Mr. Crook reasonably demonstrated to Mr. Vlisides that he wanted to appeal.  The court finds credible Mr. Crook's testimony that, when Mr. Vlisides failed to come to Talladega to discuss the appeal within the appeal deadline, Mr. Crook called Mr. Vlisides' office at least six times and left

messages with a female in his office that he wanted to talk to Mr. Vlisides about appealing his case.  Mr. Vlisides admitted in his affidavit that "[d]uring this period of representation, Crook placed numerous phone calls to my office, during which I was able to provide brief updates about the case."  (Doc. 20-8 at 3).  So, Mr. Crook knew how to get in touch with Mr. Vlisides.  And the court finds that at least one of Mr. Crook's numerous messages about his desire to appeal most likely reached Mr. Vlisides under normal procedures in the Federal Public Defender's Office. Mr. Vlisides just failed to act on them.

And Mr. Vlisides failure to consult with Mr. Crook about his appeal or file an appeal prejudiced him.  A lawyer's failure to consult about an appeal prejudices a defendant when "counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken . . . ."  *Flores-Ortega*, 528 U.S. at 484.  So, to show prejudice in these circumstances, a defendant must show a "reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed."  *Id.* at 484.  And a petitioner does *not* have to demonstrate the viability or merits of his potential appeal to establish that his lawyer's failure to consult with him about an appeal prejudiced him.  *Flores-Ortega*, 528 U.S. at 486.

Mr. Crook has shown a reasonable probability that he would have appealed but for Mr. Vlisides' deficient performance.  As stated previously, Mr. Crook

chose to enter a blind plea and preserve his right to appeal; he had a non-frivolous ground for an appeal involving the four-level enhancement for allegedly using the firearm in an assault; he was upset after the sentencing; and he contacted Mr. Vlisides' office at least six times within the 14-day appeal deadline and left messages regarding his desire to appeal his case.  All of the factors together demonstrate that Mr. Crook would have appealed had Mr. Vlisides not abandoned him.

Because Mr. Crook has shown both deficient performance and prejudice under *Strickland*, the court finds that Mr. Vlisides provided Mr. Crook ineffective assistance of counsel and will grant Mr. Crook habeas relief. In this case, Mr. Crook is entitled to an out-of-time appeal. *See Martin v. United States*, 81 F.3d 1083, 1084 (11th Cir. 1996) ("In this situation, the defendant is entitled to an out-of-time appeal, even without showing whether or not there are any viable grounds for such an appeal.").

The court will effectuate this remedy by entering an Order in 1:19-cr-296-KOB-HNJ vacating his criminal judgment; re-sentencing him and imposing the same sentence previously imposed; and advising Mr. Crook at the re-sentencing hearing of all of his rights associated with an appeal, including the time limit in which to file an appeal.  *See United States v. Phillips*, 225 F.3d 1198 (2000) (setting out these steps to effectuate the remedy for an out-or-time appeal

following the grant of habeas relief).  Mr. Crook's new appeal deadline will not begin until the court enters its re-sentencing judgment.

The court will enter a separate Order granting habeas relief in this case and separate Orders in 1:19-cr-296-KOB-HNJ vacating his sentence and setting a new sentencing hearing.

DONE and ORDERED this 24th day of February, 2022.


**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE